IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

VPP GROUP, LLC,

                              Plaintiffs,

     v.

TOTAL QUALITY LOGISTICS, LLC, and
TOTAL QUALITY LOGISTICS, INC.,

                            Defendants and Third-Party
                            Plaintiffs,

      v.

CORCORAN TRUCKING, INC.

                            Third-Party Defendant.

OPINION AND ORDER

13-cv-185-wmc

In this lawsuit, plaintiff VPP Group, LLC alleges that defendants Total Quality Logistics, LLC and Total Quality Logistics, Inc. (collectively, "TQL"), breached their contract for timely delivery of 40,000 pounds of beef, as well as committed civil theft and conversion by selling the beef to a salvage broker without VPP's consent.  In turn, TQL counterclaims for VPP's alleged failure to pay the agreed-upon $3700 fee for transportation of the beef and asserts third-party claims for indemnification and contribution against Corcoran Trucking, Inc., the carrier TQL hired to deliver the beef. Four motions for summary judgment are presently before the court.  (Dkt. ##26, 32, 44, 47.)  For the reasons that follow, the court will (1) grant plaintiff VPP's motion for partial summary judgment in favor of its breach of contract claim against TQL, and enter judgment in the amount of $56,248 on that claim, and consequently against TQL's counterclaim for breach of contract; (2) deny defendant TQL's motion for partial

summary judgment on plaintiff's claims for conversion and civil theft, finding a genuine issue of material fact as to whether VPP consented to the sale of the beef; and (3) deny TQL's and Corcoran's cross-motions for summary judgment on TQL's indemnification and contribution claims, finding a genuine issue of material fact as to which party's actions caused VPP's damages.

## PRELIMINARY MATTER

Before turning to the facts, the court must first address VPP's motion to strike certain statements in a declaration submitted by a TQL employee, Jordan Knowles. (Pl.'s Mot. to Strike (dkt. #36.)   In his declaration, Knowles relays the content of conversations (1) between Knowles and various Corcoran representatives, including apparently its "dispatcher," and (2) between Knowles and someone at VPP's customer, Don Lee Farms. (1st Declaration of Jordan Knowles ("1st Knowles Decl.") (dkt. #34) ¶¶ 13-14.)  VPP objects to proposed facts based on these portions of Knowles' declaration and moves to strike the statements in Knowles' declaration as inadmissible hearsay. (Dkt. #36.)

First, as to Knowles' statements relaying a conversation he had with Corcoran on November 13, the court agrees with TQL that statements by Corcoran employee(s) to Knowles that (1) Corcoran's driver was "on site" and (2) the delay in delivery was due to a mechanical failure are not being offered for the truth of the matter -- namely, that the driver was actually on site or that the delay was actually due to a mechanical failure -- but rather are being offered to demonstrate TQL's efforts to insure delivery.  Moreover, to

2

the extent that these statements are being offered in support of TQL's motion for summary judgment on its claims against Corcoran, the statements are also likely admissible as statements by a party opponent.[1]   Accordingly, the court will deny VPP's motion to strike those portions of Knowles' declaration describing statements attributed to Corcoran employees on November 13, 2012.

Second, Knowles' statement that he "was informed that Don Lee Farms was willing and able to receive the delivery that day" is obviously hearsay to the extent offered for the truth of the matter asserted -- that VPP's customer would have accepted the beef if it had been delivered on Tuesday, November 13, 2012 -- but may be admissible if offered for other purposes (*e.g.*, to show TQL's efforts to insure delivery). Since TQL appears to offer the customer statement for its truth, the court will disregard the statement in paragraph 14 of Knowles' declaration as support for TQL's additional proposed finding of fact ¶ 16.

## UNDISPUTED FACTS[2]

### A.  The Parties

Plaintiff VPP Group, LLC ("VPP") is a beef processor located in Norwalk, Wisconsin.  Defendant and third-party plaintiff Total Quality Logistics, LLC is a freight

---

[1] Whether Knowles can provide sufficient detail regarding *who* he spoke to at Corcoran sufficient to attribute the hearsay to Corcoran as a corporate entity can await trial, particularly since it is highly unlikely either statement would be offered for the truth of the matter asserted, even against Corcoran.

[2] Based on from the parties proposed findings of fact, the court finds the following facts to be material and undisputed when viewed in a light most favorable to plaintiff as the non-moving party.

brokerage firm specializing in full truckload shipments.  Total Quality Logistics, Inc. is the managing partner of the Total Quality Logistics, LLC.  Unless otherwise noted and consistent with the above and the parties' practice, the court refers to defendants collectively as "TQL."

TQL does not ship or deliver anything itself, but instead coordinates and arranges, on behalf of its customers, for the truckload transportation of products and goods throughout the United States and North America.  This makes TQL a "broker" in the parlance of interstate commerce.  Third-party defendant Corcoran Trucking, Inc. is a licensed carrier of products for interstate shipment.

### B.  VPP's Contract with TQL for Beef Delivery

On or about October 26, 2012, VPP's Director of Production and Marketing Steve Turriff contacted Jordan Knowles, a Logistics Account Executive at TQL, to arrange for the shipment of 40,000 pounds of beef from Norwalk, Wisconsin, to California. Upon delivery, VPP was to receive $100,248 from VPP's customer Don Lee Farms.  On October 30, 2012, TQL agreed to serve as a broker, arranging for a truck to deliver the beef to California.  The beef was to be picked up in Norwalk on Saturday, November 10, 2012, and delivered two days later on Monday, November 12, 2012.  (1st Declaration of Steve Turriff ("1st Turriff Decl."), Ex. B (dkt. #30-2) 2-3 (email exchange between VPP and TQL listing "Mon 12th delivery, pickup Sat 10th 7 am").)[3]  VPP agreed to pay TQL $3700 for the transportation of the beef.

---

[3] TQL now characterizes the November 12, 2012, date as a "target date" and describes it

*Before* agreeing to delivery on the 12th, TQL's Knowles also emailed Turriff at VPP asking whether "drop off on Tuesday/Wednesday," November 13 or 14, 2012, is an "option," offering a reduced payment of $3600.  (1st Turriff Decl., Ex. C (dkt. #30-3) 2.) Turriff promptly responded, "[n]o[,] needs to be Monday," to which Knowles replied, "[a]lright."  (*Id.* at 1-2.)  Despite this exchange, TQL contends that VPP "did not indicate to TQL that the delivery of beef would be rejected by its recipient if the delivery was not completed by November 12, 2012."  (TQL's Resp. to VPP's PFOFs (dkt. #37) ¶ 13.)

### C.  TQL's Arrangements with Corcoran

TQL arranged for third-party defendant Corcoran Trucking, Inc. to transport the load of beef on VPP's behalf to Don Lee Farms.  Consistent with TQL's agreement with VPP, the Rate Confirmation and the Driver/Carrier Information Sheet both identified November 12, 2012, as the delivery date.  (2nd Declaration of Jordan Knowles ("2nd Knowles Decl."), Ex. A (dkt. #56-1) 2-3.)  On November 9, 2012, Knowles nevertheless told a Corcoran dispatcher Kerry Byrd that VPP would "like" the beef delivered "on Monday if we could," and then later said, 'if it's got to be first thing on Tuesday, that would probably work too."  (Affidavit of Francis M. Doherty ("Doherty Aff."), Ex. 2 (dkt. #29-2) 2.)  To which the Corcoran dispatcher responded, "Yeah, that's what I would be looking at is Tuesday."  (*Id.*)  At no time, however, did anyone at TQL indicate to Corcoran that delivery could be made at any time after Tuesday, November 13, 2012.

---

as "not imperative."  (TQL's Resp. to VPP's PFOFs (dkt. #37) ¶ 11.)  The court will discuss this dispute in the opinion below.

TQL and Corcoran entered into a contract which provides in pertinent part:

> In performing services hereunder, CARRIER [Corcoran] agrees that it shall, at all times and at its own expense, provide and maintain:
>
> (a) driver(s) with enough available hours of service to pick up and complete delivery of the tendered load(s) within the time frame(s) requested by BROKER [TQL] and/or its CUSTOMER(s), without violating the FMCSA hours of service regulations contained at 49 C.F.R. § 395.

(1st Knowles Decl., Ex. A (dkt. #34-1) ¶ 2(a).)

The contract also contains an indemnification provision:

> CARRIER agrees to indemnify, hold harmless and defend BROKER and its CUSTOMERS from and against any and all claims for loss, damage or injury (including but not limited to reasonable attorney's fees), from and against any lawsuits, actions, and administrative or legal proceedings brought against BROKER or its CUSTOMERS for or on account of any loss or damage to the tangible property of BROKER, BROKER'S CUSTOMERS or other persons, or for or on account of any injury received or sustained by any person, including but not limited to employees of CARRIER . . . caused by or arising out of the performance of CARRIER, its employees or approved carriers.

(*Id.* at ¶ 10.)  In addition, the contract states in describing carrier requirements that:

> Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to the CARRIER.

(*Id.* at p.9.)  Finally, the contract contains an integration clause.  (*Id.* at ¶ 17.)

### D. Corcoran's Beef Pick-Up and Delivery

On November 10, 2012, Corcoran Trucking arrived at VPP's plant, loaded the beef and left the plant.[4]   TQL contacted VPP to confirm that the pickup was made as scheduled and that there were no problems with the arranged shipment.

On November 12, 2012, Corcoran's Kerry Byrd informed Knowles at TQL that the driver transporting the shipment could not complete delivery that day because "the driver did not have enough hours to make it to the final shipment destination." (Declaration of Kerry Byrd ("Byrd Decl.") (dkt. #40) ¶ 7.)  TQL disputes this, stating that Knowles was not informed of any delay until November 13, 2012.  (TQL's Resp. to Corcoran's PFOFs (dkt. #57) ¶ 20.)

On November 13, 2012, Don Lee Farms informed VPP that the beef had not been delivered.  VPP in turn notified TQL.  TQL then contacted Corcoran and was told that its driver was "on site."  Later that evening, TQL was informed that Corcoran still had not completed the delivery to Don Lee Farms as a result of a mechanical failure.  During that call, Corcoran also assured TQL that the truck's mechanical failure had been fixed and that the delivery would still occur that day.  Corcoran asserts that the delivery "was

---

[4] Corcoran's driver Myrna Davis avers that she informed the loader (presumably a VPP employee) at the time of pickup that it would take four days to drive to Inglewood, California for delivery.  (Corcoran's PFOFs (dkt. #49) ¶ 19.)  Not surprisingly, TQL does not dispute this fact.   But even if true, this fact does not alter TQL's contractual commitment to VPP.   First, Corcoran's driver had no authority to propose an amendment to that contract.   Second, a VPP worker on the loading dock had no authority to accept.   Third, Corcoran proposed this fact in support of its motion for judgment on *TQL's* third-party claim.   Accordingly, the fact can only be accepted as true for summary judgment purposes with respect to TQL's claim against Corcoran, not against VPP in deciding the cross-motions for summary judgment on its claims against TQL.

not affected by a mechanical failure."  (Corcoran's Resp. to TQL's Add'l PFOFs (dkt. #41) ¶ 15; *see also* Corcoran's PFOFs (dkt. #49) ¶ 23 (explaining that delay was due to the number of hours available for a solo driver); Byrd Aff. (dkt. #40) ¶ 9 ("At no time was I informed by the driver ... or anyone at Corcoran that there was any mechanical failure.").)

Corcoran Trucking ultimately attempted delivery of the beef on November 14, 2012, but Don Lee Farms refused to accept.  When Knowles learned of this, he contacted Turriff at VPP by email to determine what to do next.  VPP responded that TQL could either:  (1) reimburse VPP $100,248 due from Don Lee Farms and dispose of the beef however they saw fit; or (2) allow VPP to handle the salvage of the beef with TQL paying the difference between the $100,248 and salvage sales proceeds.  (3d Declaration of Steve Turriff ("3d Turriff Decl."), Ex. F (dkt. #54-1) 1.)  That same day, Knowles and Turriff also spoke about the delivery issue, although it is unclear whether this conversation occurred before or after their email exchange.  Knowles asked, "Do you want me to try and find somewhere to box [the beef] in the meantime? Or should I wait[?]"  Turriff responded, "Right now, I am kind of taking the position of you guys own it.  (Laughs)  You can do whatever you want with it.  We are going to just claim for it." (1st Knowles Decl., Ex. C (dkt. #34-4).)

TQL then arranged for a broker to obtain salvage value for the beef and directed the proceeds to VPP.  The $44,000 in sales proceeds that VPP ultimately received from the salvage broker was $56,248 less than the amount VPP would have received from Don Lee Farms for timely delivery of the beef.  VPP represents that if it had boxed, frozen,

8

and sold the beef itself, the sale price less the cost of boxing and freezing would have been approximately $72,000, or $28,000 more than the proceeds VPP received from TQL's salvage broker.[5]

### E.  Prior Relationship Between VPP and TQL

VPP had been a customer of TQL since November 2008.  Before the October 30, 2012, contract in dispute, VPP had contacted with TQL on at least three other occasions for deliveries to Don Lee Farms.  (VPP's Resp. to TQL's Add'l PFOFs (dkt. #37) ¶ 4.) On the two occasions immediately preceding the delivery at issue, the beef was delivered on Monday morning; on one earlier occasion, the beef was delivered on a Wednesday without complaint.  (*Id.* at ¶¶ 4-5.)

### OPINION[6]

VPP and TQL have cross-moved or summary judgment on VPP's claim against TQL for breach of contract; (2) civil theft under Wis. Stat. § 895.446; and (3)

---

[5] TQL disputes whether VPP's employee Steve Turriff has sufficient personal knowledge to opine as to the sale price VPP would have commanded had it salvaged the beef.

[6] The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Plaintiff VPP Group, LLC is a citizen of Wisconsin.  (Am. Not. of Removal (dkt. #58) ¶ 6 (noting VPP's sole member is Frederick Stewart, a citizen of Wisconsin).)  Defendant and third-party plaintiff Total Quality Logistics, Inc. is a citizen of Ohio, having been incorporated in the State of Ohio with its principal place of business also in Ohio.  Having traced the citizenship of its members, defendant and third-party plaintiff Total Quality Logistics, LLC also is a citizen of Ohio.  (*Id.* at ¶¶ 8-11.)  Third-party defendant Corcoran Trucking, Inc. is a citizen of Montana, having been incorporated in the state of Montana with its principal place of business also in Montana.  Accordingly, there is complete diversity between the parties.  Moreover, the amount in controversy exceeds $75,000 in light of plaintiff's request for exemplary damages under Wis. Stat. § 895.446.

conversion.[7]   VPP seeks summary judgment on TQL's counterclaim for breach of contract based on an alleged failure to pay TQL the agreed upon $3700 for the transport of the beef.   Finally, TQL and Corcoran have cross-moved for summary judgment on TQL's claims for indemnification and contribution against Corcoran.   The court will address each of these motions in turn.

## I.   VPP's Breach of Contract Claim Against TQL

There is no dispute between VPP and TQL that there was a contract between them, requiring TQL to deliver 40,000 pounds of beef to Don Lee Farms in California. (VPP's Br. (dkt. #27) 3-4; TQL's Opp'n (dkt. #33) 6.)   TQL offered this service, which VPP accepted, for payment of $3700.   *In re F.T.R.*, 2013 WI 66, ¶ 57, 349 Wis. 2d 84, 833 N.W.2d 634 ("The elements of a contract are offer, acceptance, and consideration.").   VPP's contract claim turns on whether TQL's failure to arrange for delivery on November 12, 2012, constitutes a material breach.   TQL contends that the breach was not material because time was not of the essence, or at least that a question of fact remains as to whether it was.

"Under Wisconsin law, time is generally not of the essence, 'unless it is expressly made so by the terms of the contract, or by the conduct of the parties.'"   *Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 692 (7th Cir. 2004) (quoting *Stork v. Felper*, 85 Wis. 2d

---

[7] VPP also asserted a negligence claim, which was previously dismissed by the court. (7/1/13 Op. & Order (dkt. #19).)

406, 270 N.W.2d 586, 589 (1978)).[8]   Where time is not of the essence, the law generally requires that the contract will be performed at or within a reasonable time. *Williams B. Tanner Co. v. Sparta-Tomah Broad. Co.*, 716 F.2d 1155, 1158 (7th Cir. 1983) ("[I]t is well accepted that, for example, when a contract is silent as to a time for performance, the law implies that it shall be performed within a reasonable time.") (citing *W. Lime & Cement Co. v. Copper River Land Co.*, 138 Wis. 404, 120 N.W. 277 (1909)).

TQL contends that November 12th was simply a "target date" because:  (1) VPP never suggested that Don Lee Farms would not accept delivery on November 13, 2012; and (2) Don Lee Farms had accepted a delivery as late as Wednesday on one prior occasion.  The undisputed record, however, does not support either contention.  First, the contract between the parties required delivery on Monday, November 12, 2012. When TQL inquired as to whether Tuesday or Wednesday delivery would be permissible, VPP responded unequivocally, "no."  In the face of this unambiguous evidence, TQL's assertion that VPP also needed to state or at least suggest that a non-party to their contract, Don Lee Farms, would not accept late delivery is not tenable.  Nor is one instance where beef was delivered to Don Lee Farms on Wednesday without complaint sufficient for a reasonable trier of fact to find that time was not of the essence with

---

[8] As TQL points out, VPP assumes without explanation that Wisconsin law governs its claims.  TQL contends that Ohio law may govern, but represents that Ohio law is the same with respect to the core issue of whether time is of the essence under the contract. (TQL's Opp'n (dkt. #33) 6.)  If there is no difference between Wisconsin and Ohio law on VPP's breach of contract claim, then the court is to apply Wisconsin law.  *See Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005) ("Under Wisconsin's choice of law algorithm, if the laws of the competing states are the same, a court must apply Wisconsin law.").

respect to *this* delivery in light of VPP's *express* condition that it be delivered *on* the 12th. The one instance of a Wednesday deliver also does not establish a course of conduct of the parties. To the extent that TQL gambled on the fact that Don Lee Farms had previously accepted a Wednesday delivery in informing Corcoran that a Tuesday delivery would be okay, it loses under its contract with VPP.

Moreover, whether the beef might have been accepted if delivered on Tuesday, the 13th, is ultimately of no import in deciding VPP's breach of contract claim, though it may be material in determining TQL's indemnification and contribution claims against Corcoran. As an initial matter, the fact that Don Lee Farms may have accepted delivery on the 13th is a non sequitor since deliver was not even attempted until the 14th. Moreover, TQL's evidence that *this* shipment of beef would have been accepted on the 13th is based on nothing more than (1) Knowles' inadmissible hearsay from an unnamed employee of Don Lee Farms, who supposedly told him that it would accept the beef the evening of the 13th, (2) VPP's after-the-fact concession that Don Lee Farms may have accepted delivery on the 13th (TQL's Opp'n to VPP's Mot. to Exclude (dkt. #42) 4), and (3) the fact that Don Lee Farms accepted a Wednesday delivery once before. In any event, delivery on the 13th would still have constituted a material breach of the parties' written, unambiguous contract.[9]

Whether time is of the essence is a question of fact. *See Employers Ins. of Wausau v. Jackson*, 190 Wis. 2d 597, 616, 527 N.W.2d 681, 688 (1995). Still, on the record here, no reasonable jury could find that TQL did not materially breach the contract by failing

---

[9] This is not to suggest that acceptance of the beef at full price by Don Lee Farms would have been immaterial, since there would have then been no *injury* to VPP.

to deliver the beef on November 12, 2012. *See Huntoon v. Capozza*, 57 Wis. 2d 447, 452-53, 204 N.W.2d 649, 652 (1973) (finding "as a matter of law" that default on a payment constituted a material breach because both the express language of the contract, as well as the parties' conduct, demonstrated that the time of the payment was of the essence). Indeed, a cursory review of case law from other jurisdictions involving delivery of perishable items demonstrates that time is of the essence is presumed in such cases. *See Lloyd Myers Co., Inc. v. Dep't of Agric.*, No. 92-70587, 1994 WL 20019, at *2 (9th Cir. Jan. 26, 1994) ("[B]ecause the subject of these sales are perishable goods, time is always of the essence.") (unpublished); *Jazz Photo Corp. v. United States*, 353 F. Supp. 2d 1327, 1355 (Ct. Int'l Trade 2004) (describing "perishable merchandise" as a situation "in which time is of the essence"); *The Ile de Sumatra*, 286 F. 437, 438 (S.D.N.Y. 1922) ("[T]ime was obviously of the essence of the contract . . . because of the perishable character of the onions."); *Farmers Elevator Co. v. David*, 234 N.W.2d 26, 30 (N.D. 1975) (describing "seasonal or very perishable commodities" as one where "time is of the essence of a contract"); *La Rose v. Dufresne*, 99 So.2d 16, 19 (La. 1958) ("[T]ime is of the essence in harvesting a sugar cane crop, because of the perishable nature of the crop.").

As part of its motion, VPP seeks entry of damages in the amount of $56,248, representing the difference between the amount Don Lee Farms agreed to pay for the beef and the amount VPP received from the salvage broker. TQL did not challenge this amount of damages in opposing VPP's motion for summary judgment. Accordingly, the court will enter judgment in favor of VPP on its breach of contract claim and will award $56,248 in damages on that claim.

## II.  VPP's Claims Against TQL for Conversion and Civil Theft

In addition to its breach of contract claim, VPP alleges claims for common law conversion and civil theft under Wis. Stat. § 943.20 in light of TQL's sale of the beef without VPP's consent or permission.  Relying on remedies available under Wis. Stat. § 895.446 for violations of § 943.20 (and other statutes) VPP seeks (1) the difference between the retail value of the beef and the amount received from the salvage broker, the $56,248 figure the court will award in any event by virtue of its grant of summary judgment on VPP's breach of contract claim; (2) "litigation and attorney fees reasonably incurred, including the value of the time spent by any employee or agent of VPP"; and (3) "exemplary damages of not more than three times the amount of VPP's actual damages."  (Compl. (dkt. #1-2) ¶ 26.)  *See also* Wis. Stat. § 895.446(3) (describing remedies).

TQL moves for summary judgment on VPP's claim for conversion and civil theft, arguing that since VPP consented to TQL's sale of the rejected beef for salvage value, it cannot prevail on a claim for civil theft or for conversion.  *See* Wis. Stat. § 943.20 (defining civil theft as where a party "[i]ntentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property of another *without the other's consent* and with intent to deprive the owner permanently of possession of such property") (emphasis added); *H.A. Friend & Co. v. Prof'l Stationary, Inc.* 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, 720 N.W.2d 96 (listing the elements of a common law conversion claim, including that the taking of property be "without the owner's consent").

14

Specifically, TQL asserts that after Jordan Knowles of TQL asked its principal contact at VPP, Steve Turriff, how it would like to proceed with the rejected beef, Turriff told Knowles that VPP, "intended to file an insurance claim for the loss sustained as a result of Corcoran's untimely delivery, and disclaimed any interest in the rejected goods or participating in the process of finding a substitute buyer."  Turriff further told Knowles that, in his mind, "TQL 'owned' the rejected goods and could do whatever it wanted with them."  (TQL's Br. in Supp. of Summ. J. (dkt. #45) 7.)  While this exchange appears to acknowledge TQL's right to dispose of the beef, an email exchange between Knowles and Turriff that also occurred on that day arguably contradicts.  In that exchange, Knowles initially asked Turriff:

> [C]an you shoot us an email with the product description and exact weights of what is on the truck?
>
> We will provide this to our salvage buyers in order to see what return we can get on this product.

(3d Turriff Aff., Ex. F (dkt. #54-1) 1-2.)  In response to which Turriff provided the required product information, but then stated:

> I want to try to help with this to minimize losses.  I need someone to give me in writing the options, example:
>
> 1.  TQL reimburses entire amount aprox $100,000 -- I stay out of it
>
> 2.  Product is boxed and TQL reimburses difference from $100,000 to include freezer / boxing costs.
>
> Right now I don't know what to do[.]

(*Id.* at 1.)

Neither party addresses which of these exchanges occurred first.  Indeed, both parties simply ignore the fact that there were at least *two* exchanges between Knowles and Turriff on the 14th.  If the telephone conversation happened *after* the email exchange, Turriff's statement that "I am kind of taking the position of you guys own it" and that TQL "can do whatever you want with it," arguably forecloses a finding that VPP did not consent to TQL's sale of the beef -- a necessary element of both claims.  (1st Knowles Decl., Ex. C (dkt. #34-4).)  On the other hand, if the email occurred second, it would appear to support Turriff's version of his exchanges with Knowles on the 14th.

Given the uncertainty of the timing of these exchanges, coupled with doubt as to how a reasonable jury would interpret the parties' exchanges both orally and in writing, renders summary judgment inappropriate.  Accordingly, the court will deny TQL's motion for summary judgment on those claims.[10]

### III. TQL's Breach of Contract Cross Claim Against VPP

TQL asserts a breach of contract cross claim against VPP for its failure to pay TQL its $3700 fee in arranging for delivery of the beef, and also seeks recovery of its attorney's fees and costs in collecting the amounts due from VPP.  (TQL's Counterclaim (dkt. #12) ¶¶ 10, 14-17.)  VPP moves for summary judgment on this claim because the delivery was not made.  (VPP's Br. (dkt. #27) 5.)  TQL failed to respond to this motion

---

[10] TQL also argues in its motion that it acted reasonably in light of a regulation governing a carrier's obligations to salvage goods.  (TQL's Br. in Supp. of Summ. J. (dkt. #45) 7-8 (citing 49 C.F.R. § 370.11).)  As VPP points out in its response, TQL is a broker, not a carrier, and therefore this regulation -- even if it could serve as some defense for Corcoran's actions -- it does not appear to govern TQL's actions.

for summary judgment.  Further, the undisputed record reflects that while delivery was attempted, it was not completed.  Accordingly, the court also will grant VPP summary judgment on TQL's breach of contract counterclaim.[11]


## IV.  TQL's Third-Party Claims Against Corcoran

Finally, TQL and Corcoran have both moved for summary judgment on TQL's indemnification and contribution claims against Corcoran.  The parties agree that the contract at issue "shall be governed by and construed in accordance with the law of the State of Ohio."  (1st Knowles Decl., Ex. A (dkt. #34-1) ¶ 15.)  Under Ohio law (like Wisconsin), the court is to enforce clear and unambiguous indemnification agreements according to their terms.  *See Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 256-57 (Ohio 1987).  Based on the indemnification language and other provisions of the contract describing the parties' respective responsibilities as quoted in the facts section above, TQL contends that summary judgment is warranted on its indemnification claim based on Corcoran's failure to deliver the beef on November 13, 2012.

In response, Corcoran posits several reasons why the indemnification clause does not apply.  *First*, Corcoran contends that the claims asserted against TQL are not within the scope of the indemnification clause because they concern economic injury, not

---

[11] An award of damages satisfying the so-called expectation interest -- which places a party in as good a position as had the contract been performed, *see Shubert v. Midwest Broad. Co.*, 1 Wis. 2d 497, 502, 85 N.W.2d 449 (1957) -- arguably would deduct the $3700 delivery charge since VPP anticipated having to pay that charge in selling the beef at issue.  TQL, however, failed to make this argument, and the court will not develop it uninvited.

property damage or personal injury.  While the indemnification clause describes "loss or damage to the tangible property," the provision also includes indemnification "for or on account of *any* injury received or sustained by any person."  (1st Knowles Decl., Ex. A (dkt. #34-1) ¶ 10 (emphasis added).)  Therefore, the clause covers not just economic injury due to delay in delivering the beef, which presumably would at least cover any diminution of value of the beef, but also related injuries sustained by TQL.

*Second*, Corcoran contends that the indemnification clause only covers damages caused by *Corcoran's* alleged failure to perform, not damages caused by TQL telling Corcoran that delivery on November 13th would probably work.  In response, TQL contends -- as it did in defending VPP's breach of contract claim -- that delivery on the 13th would have been accepted.  The only support TQL offers for this proposed fact is again hearsay from someone at Don Lee Farms.  At most, there is a dispute of fact as to whether TQL's own actions of assuring Corcoran that delivery on the 13th would be okay, ultimately contributed to VPP's damages.

*Third*, Corcoran argues that VPP's conversion and civil theft claims are solely the result of TQL's subsequent, independent actions, not of Corcoran's untimely performance, putting any damages associated with these claims outside the reach of the indemnification provision.  While TQL's decision to sell the beef *may* break any causal link between Corcoran's actions and VPP's damages with respect to those two claims, this is an issue of fact for the jury to consider as well.

*Fourth*, Corcoran contends that any agreement to indemnify a party for its own negligence must be explicit, while the indemnification clause between Corcoran and TQL

contains no such language.  TQL ostensibly agrees with Corcoran on this point, asserting that it "has never argued that the parties' indemnification covers TQL's own negligent or intentional conduct."  (TQL's Reply (dkt. #43) 8.)[12]  As such, TQL's indemnification claim against Corcoran turns on whether Corcoran or TQL (or both) are responsible for VPP's damages.

*Fifth*, Corcoran contends that any claim for contribution fails because the parties must be liable for the same obligation, reasoning that since Corcoran is not a party to the contract between VPP and TQL, it cannot be liable for the same obligation as TQL.  In response, TQL argues that contribution is appropriate here because the parties are subject to "common liability," which does not hinge on Corcoran being a party to the contract between TQL and VPP.  (TQL's Opp'n (dkt. #55) 9 (citing *Henry v. Consol. Stores Int'l Corp.*, 624 N.E.2d 796, 799 (1993) ("The right of contribution exists only in favor of a tortfeasor who has paid more than his proportionate share of the common liability.")).)  The court agrees that Corcoran's view of TQL's contribution claim is both too narrow and unsupported by any case law.  Accordingly, the court will deny Corcoran's motion for summary judgment on TQL's contribution claim.

*Sixth*, Corcoran argues that TQL's claims are preempted by the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c)(1), which provides in pertinent part:

---

[12] As Corcoran points out, indemnification of TQL's intentional conduct would be counter to public policy under Ohio law.  (Corcoran's Opp'n (dkt. #39) 6-7 (citing *Diamond Wine & Spirit, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 781 (Ohio Ct. App. 2002).)

> a State . . . may not enact or enforce a law, regulation, or
> other provision having the force and effect of law related to a
> price, route, or service of any motor carrier (other than a
> carrier affiliated with a direct air carrier covered by section
> 41713(b)(4)) or any motor private carrier, broker, or freight
> forwarder with respect to the transportation of property.

Corcoran argues that TQL's indemnification and contribution claims related to Corcoran's "services" are, therefore, preempted.  (Corcoran's Br. (dkt. #48) 12-13.)  As Corcoran itself acknowledges, however, TQL relies on the parties' contract in support of its claims, not a state statutory or regulatory requirement concerning Corcoran's services.[13]  Accordingly, the court will deny Corcoran's motion for summary judgment on this basis.

*Seventh* and last, Corcoran contends that TQL's claims are also preempted by the Carmack Amendment, 49 U.S.C. § 14706, which provides in pertinent part:

> A carrier providing transportation or service . . . [is] liable to
> the person entitled to recover under the receipt or bill of
> lading. The liability imposed under this paragraph is for the
> actual loss or injury to the property caused by [the carrier].

(Corcoran's Br. (dkt. #48) 14-15.)

TQL responds that the Carmack Amendment does not apply to its third-party claims against Corcoran because "[w]hile Carmack provides the exclusive means for a shipper seeking recovery from a carrier under a bill of lading, it does not govern

---

[13] Corcoran nevertheless persists, arguing that "the mere fact that the claim is based in contract does not automatically shield the claim from preemption" by the FAAA. (Corcoran's Br. (dkt. #48) 13 (citing *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 n.8 (7th Cir. 1996)).)  In *Travel All Over*, the Seventh Circuit found that a claim for punitive damages was preempted by the FAAA because the state's public policy concerns were implicated in such an award.  There is, however, no such public policy concern at issue here.

brokerage relationships or otherwise preempt claims by a broker pursuant to an independent agreement with the carrier." (TQL's Opp'n (dkt. #55) 11 (citing *InTransit, Inc. v. Excel N. Am. Rd. Transp., Inc.*, 426 F. Supp. 2d 1136, 1141 (D. Or. 2006); *Exel, Inc. v. S. Refrigerated Transp., Inc.*, No. 2:10-cv-994, 2012 WL 3064106, at *5 (S.D. Ohio July 27, 2012).)  In *InTransit, Inc.*, the district court confronted the same issue as here: whether the broker's claims of contractual indemnity against a carrier were preempted by the Carmack Amendment.  In holding that Carmack did not apply, that court explained:

> This action is sufficiently removed from a shipper or some other party who has rights under the bill of lading to sue a carrier for damage to goods shipped.  The purpose of Carmack is to prevent carriers from being placed in the untenable position of having to determine what their liability may be in many jurisdictions with differing laws.  But, in this case, the alleged liability arises from a contract that will not be interpreted differently from one jurisdiction to the next[.]

426 F. Supp. 2d at 1141; *see also Exel, Inc.*, 2012 WL 306416, at *5 (finding Carmack did not apply to claims arising out of broker-carrier contract because this relationship "falls outside of the shipper-carrier relationship and outside of the preemptive field of the Carmack Amendment"); *Transcorr Nat'l Logistics, LLC v. Chaler Corp.*, No. 1:09-cv-00375-TAB-SEB, 2008 WL 5272895, at *3 (S.D. Ind. Dec. 19, 2008) (similarly holding Carmack did not apply to a broker's claim arising under a carrier agreement, explaining that "[l]iability issues under broker-carrier contracts do not raise the same concern because parties to the contracts may reasonably expect that their contracts will be interpreted consistently by the law of the jurisdiction in which the contract was made").

Relying on language in *InTransit* that "case law appears to go either way on the issue of the applicability of Carmack to brokers," 426 F. Supp. 2d at 1139, Corcoran

urges the court to reject *InTransit* and the other cases holding that Carmack does not apply. However, the court in *InTransit* may not even have been referring to the specific issue raised here, since there were three challenges to the Carmack Amendment's application in *InTransit;* but even if it were, this court could find no cases where Carmack was applied to a broker's claim based on contractual indemnification, nor has Corcoran directed the court to such a case. *See Dominion Resource Servs., Inc. v. 5K Logistics, Inc.*, No. 3:09-CV-315, 2010 WL 679845, at *5 (E.D. Va. Feb. 24, 2010) (holding that Carmack barred a broker's contract claim but distinguishing *InTransit* on the basis that it dealt with contractual indemnification).

Corcoran also contends that applying the holding in *InTransit* would be unfair because it would allow shippers to bypass the restrictions on liability under Carmack by simply using a broker.[14] This argument might have more merit if TQL were asserting claims as an assignee of VPP's claims arising under a bill of lading, *see InTransit*, 426 F. Supp. 2d at 1141, but that is not the case here. Instead, TQL asserts contractually based indemnification claims, and that difference places TQL's claims outside of the scope of the Carmack Amendment. Accordingly, the court will reject Corcoran's motion at this time without prejudice to being renewed at trial.

---

[14] The court acknowledges that aspects of the *InTransit* opinion are open to challenge but Corcoran has not adequately developed this argument on summary judgment.

22

ORDER

Consistent with the above, IT IS ORDERED that:

1) plaintiff VPP Group, LLC's motion for partial summary judgment (dkt. #26) is GRANTED in favor of VPP on its breach of contract claim against defendants Total Quality Logistics, Inc. and Total Quality Logistics, LLC, in the amount of $56,248;

2) for the same reason, TQL's breach of contract claim is dismissed with prejudice;

3) third-party plaintiffs Total Quality Logistics, Inc. and Total Quality Logistics, LLC's motion for partial summary judgment against third-party defendant Corcoran Trucking, Inc. (dkt. #32) is DENIED;

4) plaintiff's motion to strike hearsay from Knowles' declaration (dkt. #36) is DENIED, but Knowles' statement that "I was informed that Don Lee Farms was willing and able to receive the delivery that day" in paragraph of his 1st Declaration (dkt. #34) is struck as support for TQL's additional proposed finding of fact ¶ 16;

5) defendants Total Quality Logistics, Inc. and Total Quality Logistics, LLC's motion for partial summary judgment on plaintiff's claims for conversion and civil theft (dkt. #44) is DENIED;

6) third-party defendant Corcoran Trucking, Inc.'s motion for summary judgment on third-party plaintiff's claims (dkt. #47) is DENIED;

7) in advance of trial, the parties should take note that the Procedures Governing Final Pretrial Submissions and Conference for Jury Trials, which is attached to the Preliminary Pretrial Conference Order, erroneously references ¶ 7 of the Pretrial Conference Order.  (Dkt. #10 at pp. 19-20.)  Instead, the parties should refer to ¶ 6 (setting April 18, 2014, as the deadline for Rule 26(a)(3) disclosures and all motions in limine) in determining the due dates for various pretrial submissions; and

8) the final pretrial conference now will be held on Wednesday, May 14, 2014, at 2:30 p.m.


Entered this 18th day of April, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge